27083. ROBINSON *v.* DeVAUGHN.

38

DECIDED NOVEMBER 25, 1938.

*G. C. Robinson, Jule Felton,* for plaintiff.

*Fort, Fort & Fort, B. F. Neal,* for defendant.

SUTTON, J. Adam A. Robinson brought suit against Carl L. De-Vaughn for damages alleged to have been sustained by reason of an illegal assault and battery made on him by the defendant. The petition, after certain portions had been stricken by a ruling on demurrer, alleged that the families of the plaintiff and the defendant have been good friends all of their lives, and that there had never been the slightest friction between the plaintiff and the defendant prior to the alleged assault and battery; that the defendant married a niece of Mrs. A. C. Richardson and A. C. Richardson by marriage; that plaintiff is a pharmacist and druggist, and worked for a number of years for his brother, J. H. Robinson, deceased, who rented a store from A. C. Richardson, and that plaintiff knew the wife of the defendant well on account of her trading at said store before her marriage; that on a certain occasion the defendant came to the plaintiff and asked him to cease teasing the wife of defendant because it made her nervous and tore her up, and that plaintiff replied that if the defendant would keep his wife from teasing the plaintiff the plaintiff would assure him that there would be no response on his part; that just a short while later the brother of the plaintiff, Gilbert C. Robinson, came to him and told him that the defendant had stated to him that plaintiff made cutting remarks to defendant's wife and that defendant had requested G. C. Robinson to see the plaintiff and have the teasing stopped; that thereafter the plaintiff did not speak to defendant's wife for over four months, although they were often thrown together, it being his intention to give no offense in any way whatever; that on Thursday night, November 12, 1936, plaintiff and his wife were hosts at a social club at Montezuma, of which club the defendant and his wife were also members, and that on that occasion every vestige of any strain between them seemed to be absent and there were hospitality and pleasantness and assurance of friend-

ship between them; that on Friday morning thereafter, between eight and nine o'clock, plaintiff went to the A. & P. chain store at Montezuma, which store is under the management of Mr. Otto Liggin, a most reputable and honored young man, a widower, with reference to whom the young people of the town often tease one another, and plaintiff intended to make small purchases of groceries, and at the time the defendant's wife was in the store and behind the counter, being waited on by Mr. Otto Liggin; that after some delay plaintiff made his purchases and left the store, saying nothing whatever to the defendant's wife, went to the drug store where he worked, got certain packages which were to be delivered to customers, and went out to find his delivery boy whom he usually called by whistling; that as he got in the street near the A. B. & C. Railroad the wife of defendant passed close to him in an automobile and he said to her "Hello, Otto;" that at the time she was headed towards her home and turned to the right and parked her automobile just beyond Cherry Street on the right, and as plaintiff went across Dooly Street in search of his delivery boy she got out of her car and came to plaintiff; that he again spoke to her and she told him that she proposed to inform her husband that the plaintiff had been teasing her again; that plaintiff said to her "I think you will make a mistake to do that as I have intended you no harm, and there is nothing to report to him;" that plaintiff charges that such statement was what the defendant acted on as the provocation of what was later done by him; that plaintiff is informed that she went to her husband, who does business in the store next door to where plaintiff worked, and that he went out in search of the plaintiff, inquiring for him to see if plaintiff was at his prescription desk, and remaining in front of the drug store for some time until plaintiff's return; that plaintiff did not expect any trouble and did not know that the defendant was mad until he got right at the defendant but could tell that the defendant was in the height of anger; that plaintiff told him to "let's go in the defendant's store and that he would be glad to talk to him;" that the defendant then struck the plaintiff in the face, evidently with some instrument, although plaintiff did not see it, plaintiff being blind in one eye which was next to the defendant and was going in the store of the defendant when struck; that the lick with such instrument was of such force that plaintiff was knocked insensible immediately and

knew nothing thereafter; that he had his glasses in his hand and expected no trouble with the defendant, was struck from his blind side and being knocked lifeless did not touch the defendant at all; that the assault and battery upon him by the defendant was cowardly, brutal, wanton, wilful, and unprovoked, and that he sustained certain described injuries for which he sues; that plaintiff is a poor man with a wife and one daughter fourteen years of age, makes his living on a salary of $100 per month, rents his home and has no property whatever; that the defendant is of considerable financial worth inherited from his father, and that the plaintiff in stating the worldly circumstances of the parties can not allege the exact extent of the defendant's worth; that plaintiff is forty-seven years of age and weak from necessary business confinement and inability to take exercise, and that the defendant is a young, swarthy athlete of great strength and physical power, and that plaintiff is no match for him physically if he had not been blind and if he could have seen the defendant striking him and have warded off the outrageous attack; that the assault upon plaintiff had all of the wilful ingredients above mentioned and was most aggravated in every detail of the performance in the act and the intention, and plaintiff sues for punitive damages also, laying the compensatory damages for his injuries, pain and suffering, at $10,000, and exemplary or punitive damages at $10,000, and prays judgment for $20,000.

The defendant filed a plea and answer denying the substantial allegations of the petition, further alleging, omitting certain portions stricken on demurrer, that after leaving the A. & P. store, as referred to in the petition, and as his wife turned her car around and was driving towards her home the plaintiff placed himself in the middle of Dooly Street where he knew she would be forced to pass in going to her home, and that, after making a whistling sound to attract her attention, hollered out in a rather loud tone "Hello, Otto;" that defendant's wife immediately parked her car, and as she approached the plaintiff he again spoke to her and she told him that she was going to report to her husband the remark he had made, plaintiff replying that she would make a serious mistake in doing so; that his wife came to him and reported that the plaintiff had been annoying her; that she was crying as she approached, and that, although he had on numerous occasions admonished the plaintiff not to annoy his wife, he saw the plaintiff immediately

after the defendant's wife had reported the incident to him, and that, before the defendant had gotten up to the plaintiff, the plaintiff invited him to go into the plaintiff's drug store and talk the matter over. The plaintiff filed demurrers to the plea and answer, the ruling on which will be discussed hereinafter. Certain portions of the plaintiff's petition, not included in the foregoing statement, were stricken by the court in ruling on demurrers filed by the defendant, and will be referred to hereinafter in connection with the plaintiff in error's assignments of error.

The defendant amended his plea and answer, after the introduction of evidence, alleging that after his marriage during the year 1930 he returned with his bride to Montezuma and made their home there, and that they have lived there continuously since; that soon after their arrival in Montezuma a friendship was formed between the plaintiff and his wife and defendant and his wife, and that for some time this friendship between the two families grew stronger and stronger and their visits became more frequent; that this friendship was thoroughly enjoyed until the defendant's wife was forced by circumstances hereinafter set out to observe that the plaintiff was undertaking to improperly construe the friendship between himself and the defendant's wife, and that the observations of the defendant's wife forced her to the conclusion that his friendship was of questionable motive; that on one occasion the plaintiff undertook to kiss the defendant's wife while she was in the drug store where the plaintiff worked; that at first she did not treat the incident with the seriousness which she afterwards learned it involved, and that, just as soon as she questioned the plaintiff's motives of the friendship which he professed to have, she abandoned his company and did not desire any further social relation with him; that it came to the knowledge of the defendant's wife that there had been some criticism regarding the attention which the said Robinson was showing her, and that at the very first intimation of any unjust or unfair criticism she went to the home of the plaintiff's wife and informed her that if there had been any gossip or criticism of any conduct on the part of her and the plaintiff it was wholly unfounded, without any basis on her part, and that so far as she was concerned the social relations existing between her and the plaintiff would be severed; that three and a half years or four years previously the plaintiff committed battery upon the de-

fendant's wife; that there was a social gathering at what was known as the "Old Club House" in Montezuma, and that on that occasion, at night, the wife of defendant went out on the porch alone, to get some fresh air, that the plaintiff followed her out on the porch of the club, got hold of her arms and attempted to keep her out there, whereupon she was so indignant and aroused by the plaintiff's conduct that in her utter contempt for such treatment she slapped the plaintiff and walked back into the club rooms; that just as soon as she learned or had reason to believe that the motives of the plaintiff were ulterior defendant advised him that he did not want him to take the liberty of teasing, annoying, or even speaking to his wife in any manner that would indicate or suggest any familiarity whatever, and that, although he advised the plaintiff that he wanted him to desist, the said plaintiff continued, over the protest of defendant, and in defiance of his request, to continue to annoy, harass, tease, and embarrass defendant's wife, in that for a period of some two years he would continually and deliberately follow her into the various stores of Montezuma, and without any cause whatever other than to embarrass, harass, and annoy her, and this conduct on his part was so palpable that it was easily noticeable by the public at large; that, in addition to this, if she talked with any other man, he would take the liberty and seek the occasion to endeavor to embarrass, harass, and annoy her by referring to her in salutations using the name of the gentleman with whom she would converse; that defendant gave to her, as a Christmas present, a bale of cotton, and she undertook to sell it by her own efforts and contacted one Cack Montford, a cotton buyer, and no sooner had the plaintiff learned of it than he referred and spoke to her on the next occasion as "Hello, Cack," meaning to express in somewhat contemptuous terms his jealousy of her being in the company of said Montford; that on another occasion she contacted one W. E. Marshall, and as soon as the plaintiff learned of that he again referred to her by using his name, thus again, in this contemptuous manner, expressing his jealousy, this condition continuing in this manner from time to time, although the plaintiff had been admonished by the defendant to desist from annoying, harassing and embarrassing his wife, and on three separate occasions he made demand on the plaintiff that such conduct be discontinued, and while after these remonstrances the acts would cease for a time

they would again flare up and thus the admonitions of the defendant be ignored; that the defendant's wife complained to defendant again that the plaintiff had not desisted in his conduct towards her, and defendant, desiring to avoid any personal difficulty, went to see the brother of the plaintiff, namely, G. C. Robinson, at his home in July, 1936, and narrated to him the conduct which the plaintiff was insisting on carrying on with defendant's wife, whereupon the said G. C. Robinson promised defendant that he would see his brother, and assured defendant that no further complaint would ever be made on account of the conduct of the plaintiff towards the defendant's wife, and G. C. Robinson did see the plaintiff as promised; that from July, 1936, until November 12, 1936, there was no complaint on the conduct of the plaintiff towards defendant's wife, but that on the night of November 12, 1936, the plaintiff and his wife were host and hostess at a club meeting, of which club defendant and his wife were members, and to which they had, by virtue of their membership, all the rights and privileges afforded thereby, and on this occasion when the club meeting was had supper was served and the said wife of defendant observed, for the first time since July, that the plaintiff was taking or undertaking to take advantage of the social situation in which they were placed to renew his social relations with her, and, without causing embarrassment to any of the guests present, she endeavored to avoid his company and at the same time not cause any scene at this pleasant social event, but the plaintiff was insistent on forcing his affections on her and, despite her efforts to avoid him, he persisted in his endeavor to renew the friendship which he had violated and which had been discontinued at her request; that on the morning of November 13, 1936, defendant was engaged at his place of business, a hardware establishment, being in the second story of the building and preparing a gasoline engine for delivery to a customer, the place of business of defendant being next door to the store where the plaintiff worked; that the wife of defendant came to the business section of Montezuma to do her household shopping and walked into the A. & P. store, and while in there she was followed by the plaintiff, who deliberately and intentionally came into said store, not with a view of making any purchases, but with a view of harassing, annoying and embarrassing the wife of defendant and undertaking to renew and revive the friendship which defendant's

wife had been forced to sever; that as she made her purchases and turned to go out of the store and get in her automobile and start home, which was about nine o'clock in the morning, and as she proceeded down Dooly Street, she observed in the middle of the public street and highway that the plaintiff had preceded her and had gotten to a point about midway of the street, that he was standing still therein, forcing her to slow down her car to avoid running over him, that he whistled to attract her attention and she brought her car to a complete stop, and he again renewed and continued to carry on by saying and hollering in a contemptuous way "Hello, Otto," she having just returned a few minutes before from the A. & P. store of which Mr. Otto Liggin was manager; that she immediately got out of her car and walked up to the plaintiff and said, "I am going and tell my husband to see if he can't make you stop teasing and annoying me," whereupon the plaintiff replied, "You had better not do that; if you do you will be sorry;" that she proceeded immediately to the place of business of the defendant, called him and related what had happened, she crying at the time, whereupon the defendant, who was then in his shirt sleeves, walked out of the building down to the place of business of the plaintiff, next door, and inquired if the plaintiff was in, and, on being told that he was not, defendant remained on the outside and saw the plaintiff approaching; that when the plaintiff was within some ten or twelve feet of defendant the plaintiff invited the defendant to go into the latter's store and talk the matter over with the defendant's wife, thus seeking to accomplish in the presence of the defendant himself that which the defendant had expressly forbidden the plaintiff to do, and that the defendant, after using all persuasive methods to force the plaintiff from undertaking to force his affections upon defendant's wife, and with a view solely of preventing an impending, urgent, and immediate attempt on the part of the plaintiff to continue to carry on in annoying, harassing, and embarrassing defendant's wife, defendant struck the plaintiff with his bare hand, which was not done in a spirit of revenge but in a spirit solely to keep the occurrence of the indignities from happening again; that although defendant had used all reasonable, persuasive, and gentle efforts to forbid the plaintiff from harassing, annoying, and embarrassing defendant's wife, he was forced by cir-

cumstances to resort to the means employed to prevent further recurrences as set out above.

The plaintiff demurred to this amendment on several grounds, all of which were overruled by the court, and the plaintiff filed and had certified his exceptions pendente lite. The jury returned a verdict in favor of the defendant. The plaintiff filed a motion for new trial on the general grounds and several special grounds hereinafter referred to. To the ruling of the court on the plaintiff's demurrer to the original plea and answer of the defendant, to the ruling of the court sustaining certain grounds of the defendant's demurrer to the petition, and to the ruling of the court on the plaintiff's demurrer to the defendant's amendment to his plea and answer, the plaintiff filed and had certified exceptions pendente lite, and error is assigned on all the grounds thereof, as well as on the judgment of the court overruling the plaintiff's motion for new trial.

The evidence introduced on the trial of the case was given in much detail as to events preceding the assault and battery complained of, but for the purpose of the decision on the merits of the case may be substantially condensed as follows: The families of the plaintiff and defendant were close friends. Robinson, the plaintiff, worked in a drug store as prescription clerk. The defendant's wife often had occasion to go to the store on business, and, on account of the relations between the parties, the defendant often left her there while he attended a picture show. Occasionally she would drive the plaintiff to his home in her automobile. Sometimes the defendant was present and sometimes not. There was evidence that the plaintiff was very desirous of being in her presence. He testified that his association with her was purely platonic, that he had known her since she was a girl, and that his interest was genuine and without design. But in time she became suspicious of his attitude and requested that she be let alone, and while she did not in the outset report to her husband his acts, which she termed annoying, and which she testified came under public notice, she finally did so. There was evidence that, in order to be about her, the plaintiff often followed her into the stores of Montezuma which she had entered for shopping purposes. On one occasion, according to her testimony, he kissed her while she was present in the drug store where the plaintiff was employed, and while she testi-

fied that she did not at the time resent it, and did not report the incident to her husband until long afterwards, regarding the act as a bit of foolishness on the part of the plaintiff, she subsequently, because of his persistent conduct, looked upon his act as of ulterior motive and abandoned him, requesting that she be let alone. The plaintiff denied that the incident took place. She also testified that at a club house, three or four years before the assault and battery, he made himself objectionable by following her to the porch to which she had repaired for fresh air, and that by catching hold of both her arms sought to restrain her from rejoining the assembled guests, imploring her that their friendship be resumed. The plaintiff admitted that he had gone out on the porch and had had a conversation with her, had taken hold of her arms, but had not sought to restrain her. There was uncontradicted testimony that the plaintiff frequently teased or annoyed her under the following circumstances: Robinson would observe her talking to some gentleman friend, and on seeing her later would attract her attention by saying, for instance, "Hello, Cack," using the first name of the gentleman he had seen her conversing with. After she reported to her husband the conduct of the defendant, he on one or more occasions requested the plaintiff to cease annoying his wife. Subsequently he enlisted the aid of the plaintiff's brother, informing him that he wished to avoid a personal difficulty with the plaintiff, and requesting that the brother speak to the plaintiff about the latter's conduct and dissuade him from any repetition. Thereafter, for a period of several months until the night of November 12, 1936, the plaintiff refrained from speaking to the defendant's wife. On the night of November 12, 1936, at a club of which both families were members, the plaintiff, under the social opportunities and amenities of the occasion, attempted to renew his friendship or attentions, the wife of the defendant dancing and conversing with him because, as she testified, she did not wish to cause a "scene." On the following morning she visited the A. & P. store in the city for shopping purposes. While there she was waited on by a clerk whose first name was "Otto," a widower, and during her visit the plaintiff also came in the store. Without any conversation taking place between her and the plaintiff, she left the store, entered her automobile and started for her home. The immediate incident which led to the assault and battery took place shortly afterwards,

and for a proper consideration it is desirable to set forth at this point the testimony of the plaintiff and of the defendant.

The plaintiff testified: "Something happened to me on Friday morning, the 13th day of November, last year. I was struck and beat up by Carl DeVaughn Jr. I did absolutely nothing to make him strike and beat me up. I did not try to hit him. I told him we would go in the store, and if he had anything to say to me I would like for him to say it in the presence of his wife so she could hear it all. That is all I said to him. I gave him no offense at all. He was in his shirt sleeves. I don't know how many times he hit me. I was not expecting to be hit, and the first lick dazed me and I didn't know anything else about what happened. . . I did not see his hands. They were in his pockets when I stepped up to him, and I thought he was going in the store where his wife was. . . My eyesight is not good. I have naturally lost one eye, the left eye. I have no vision out of that at all. My right eye is weak. I wear my glasses in the store practically all the time, but when I come outside they bother me, and I take them off in the glare and carry them in my hand. That is a habit of mine. I had them in my hand that day. I had them in my right hand, and had them in my hand since coming from further up the street, and had them hooked where I would not drop them, hooked glasses. They could not fall, and I carry them that way a good part of the time. . . If I had been expecting any trouble with DeVaughn when he met me in the street I would have had something in my hand besides glasses. . . It had been around thirty minutes since Mrs. DeVaughn had told me that she was going to report to him but she did not say I was bothering her. . . I said 'Hello, Otto.' That was not her name. The night before we had a dance. She attended and I attended, and I danced with her two or three times, and it was a continuation of the pleasantries we had the night before. She knew I did not mean any harm in calling her 'Otto.' I told her so at the time. I don't know why I said it. That is one of the things I can't explain. I don't expect I have ever called any other married woman by that particular name. I did not holler out to her. She was passing in the car and I said 'Hello, Otto,' and held out my hand. She never asked me not to speak to her any more. I am positive about that. . . She told me she was going to tell Carl Jr. what I said to her, and I

said I certainly did not mean any harm in what I said, 'You realize nobody heard it if there had been any harm in it,' and I advised her not to do it. . . I did not see no use of going and telling him something to get him all aroused. . . I did not make no whistling sound after seeing her in the A. & P., and did not place myself in the middle of the street. I left the store and crossed the street, and she passed me at the tracks. She looked at me and I threw up my hand, and I said 'Hello, Otto.' She had been very pleasant and nice the night before. I did not invite him in the store. I said I would go in his store with him. When I got right up to him I saw he was excited and wrong, and it popped in my mind right then she had told him. I had gotten nearly on him when I saw him. I asked him to go in the store because it had been thirty minutes before she told me she was going to tell him, and I wanted her to be there and hear what I was going to tell him and clear it all up in there. There was nothing to clear up then. What I said, it was not any damage, and was not any intended damage, and she knew it and he knew it. I wanted her to tell her husband what I said, and then I wanted to tell her husband just what I meant by it. . . I suppose his wife was in his store at that time. She told me the last time I had seen her she was going to his store. That was the reason I told him let's go in his store and talk it over. I walked right straight up to Carl De-Vaughn. I told him to let's go in the store and took a step past him and could not see him from that side. This eye is bad and I did not know any more. I thought he was stepping with me. I thought he was going with me to his store. He hit the other eye. My left side was toward him and he struck me on my right side. He hit me from behind. . . I had my glasses in my right hand all the time."

The defendant testified: "I came down town about six-thirty or seven o'clock the following morning, and had sold a gasoline engine to John McKenzie, and I had robbed that engine to get some parts off of it to get some more, and John said he was going to send his truck in to get that engine that morning, and the parts came by express, and I went upstairs to put them on the engine, and she came in crying, calling me, and I came downstairs, and she says 'Carl, you have got to go see Adam,' and I says 'You be quiet, I will go see him,' and I went in the drug store and walked

to the prescription counter and asked for him and he was not in, and I walked out to the front and saw him by the express office coming across by the hotel, and he turned in the A. & P. store and stayed there a few minutes and come down the street. When he got in front of the ten-cent store he took off his glasses and put his glasses in his pocket, had on a double-breasted suit. When he got in front of McKenzie's he said 'We will go in the store and talk,' and I says 'We can talk right here,' and that is when the fight occurred. I walked to him and met him and he met me and I swung at him. I missed him the first lick, and then I hit him three more, if I remember correctly, with my fist. I had no weapon. . . I had not seen him that morning. I had told him before what I was going to do. My last conversation was that if I ever come to see him any more I was going to beat hell out of him. There had been nothing said between Adam Robinson and I that morning before that occurrence. I acted on my wife's report of this incident just as soon as I could walk out of my store and find him. . . My wife said he called her, whistled to her, and said 'Hello, Otto.' She told me at that time she was going down Dooly Street right in front of the shooting gallery and Montezuma Clothing Company. That was seventy-five or a hundred yards from my place of business. I had to wait for Adam Robinson about five or ten minutes, not over five or ten minutes. I hit Robinson because I told him before I would, if he annoyed my wife or said anything else to her. I had told him previously if he said anything else to her I would hit him, and she told me he had spoken to her and I went up to resent and hit him as I had agreed to. . . All the past occurrences with my wife made me do that, and that and that alone was the reason I did it. I don't know whether you would call it punish or not. I did what I told him I would do. I was carrying out a contract with him. I hit him as per contract. I told him if he did it he had the privilege of not doing it or the other. He liked to have run my wife crazy." After detailing the manner in which the plaintiff teased her about other men, the defendant testified: "I don't remember any more complaints against Adam Robinson on account of my wife except just the way she told me he worried her to death, and I watched it and seen it myself and I acted on my own initiative. . . I don't know anything about any infatuation and don't claim it,

and did not knock him down on account of that. I don't know whether or not I claim indecency to my wife from him in a moral way. I am not suspicious of her. His attitude and his words brought all this thing up. . . It was to keep her from being annoyed every day in performing her civil duties in town. The reason I struck him was to prevent any further annoyances, those I had discussed with him, promised myself and him. I did not promise myself I would hit him; I promised him, promised myself and him. After I said I hit him under contract I did not confer with my counsel during the recess on that point. There was something said about it."

Mrs. Carl DeVaughn Jr., wife of the defendant, testified as to the events immediately preceding the assault and battery: "On the morning after this seven o'clock meeting [at the club] I went to town. . . He [Robinson] saw me drive up and walk in the A. & P. store and he walked in. He did not say anything to me in the grocery store, but when I walked out he had been down to Dr. Walker's. He got in the middle of the street, and when I got by him then he hollered 'Hello, Otto,' to me. I immediately pulled to the curb and called him to me the second time. I met him on the railroad track, and I says 'All right, I have taken the last thing I am going to take. I am going to tell Carl, and you know what he is going to do to you if he can. He is going to half-kill you,' and he says 'All right, you are going to be sorry.' I went in the hardware store and called Carl and told him. When I went in the store and called my husband, naturally I was very much upset. I don't recall any of the occurrences that immediately happened. Mr. Robinson was not in the A. & P. store when I went in there. They have a counter that runs right in front of the window, and I was standing there picking out the oranges I was going to buy, picked them out myself. I stood where I was after he came in. Otto Liggon was waiting on me. I have no middle name. I never had any one else to call me Otto in my life. . . When I drove down the street I had the window up. It was a little bit cool, a cool morning, and I had the window up, and to attract my attention, because I never looked his way, he kind of whistled. I could hear the whistle all right. I guess he whistled with his mouth. It sounded like it. It was not what attracted my attention to him at that time. I saw him step out in the street. He

had time to get across the street, because I slowed down to make up my mind whether to pass him or not, and I had a pair of pants in the back of the car that I was going to put out at the pressing club, and I said to myself 'Why drive around the back way in Montezuma and have to come back to town and put out these pants?' He was right at my car in the street. There was nobody in the car with me. . . My purpose in stopping was to reprimand Adam for speaking to me. He said 'Hello, Otto.' He was whistling at me. He never whistled at me before. He was right at my car. . . The reason I proposed to sever all relations with Adam Robinson, among other things, was that I did not want to be talked about on account of him or anybody else."

■ The assault and battery of which complaint is made is admitted by the defendant, but he defends on the ground that his act was justified by what he contends to be opprobrious words used by the plaintiff at the time of the assault and battery. Before ruling on the general grounds of the motion for new trial certain principles of law may appropriately be set forth. By statute, now codified as Code, § 26-1409, it was provided: "On the trial of an indictment for an assault, or an assault and battery, the defendant may give in evidence to the jury any opprobrious words, or abusive language, used by the prosecutor, or person assaulted or beaten; and such words and language may or may not amount to a justification, according to the nature and extent of the battery, all of which shall be determined by the jury." Code § 105-1801 provides: "In every case of tort, if the defendant was authorized by law to do the act complained of, he may plead the same as a justification; . . ." It was early held that opprobrious words must be such as are uttered in the presence of the assaulting party and "which, in their nature, . . are supposed to arouse the passions, and justify, under certain circumstances to be adjudged by the jury, instant and appropriate resentment, not disproportioned to the provocation." *Mitchell* v. *State,* 41 *Ga.* 527. See also *Berry* v. *State,* 105 *Ga.* 683 (2) (31 S. E. 592); *Haygood* v. *State,* 137 *Ga.* 168 (73 S. E. 81); *Cole* v. *State,* 2 *Ga. App.* 734 (59 S. E. 24); *Cowart* v. *State,* 9 *Ga. App.* 169 (70 S. E. 891); *Haygood* v. *State,* 10 *Ga. App.* 394 (73 S. E. 423). This same principle applies in civil cases. *East Tenn., Va. & Ga. Ry. Co.* v. *Fleetwood,* 90 *Ga.* 23 (3) (15 S. E. 778); *Mason* v. *Nashville &c. Railway Co.,* 135 *Ga.* 741, 757 (70

S. E. 225, 33 L. R. A. (N. S.) 280). In *Thompson v. Shelverton,* 131 *Ga.* 714 (63 S. E. 220), it was held: "In an action for damages on account of an assault and battery, the defendant may give in evidence any opprobrious words or abusive language used by the plaintiff to him, in order to justify his conduct or mitigate the damages; and it is for the jury to determine, in view of the character of the provocation and the nature and extent of the battery, whether such opprobrious words or abusive language amount to a justification or only to a mitigation of damages recoverable." Where the words used by the party assaulted are obviously not opprobrious, the trial court may so determine as a matter of law and instruct the jury accordingly. In *Nobles* v. *State,* 12 *Ga. App.* 355 (77 S. E. 184), it was said: "Opprobrious words or abusive language may justify a battery, it being for the jury to determine whether the provocation is sufficient. Penal Code, § 103 [Code of 1933, § 26-1409]. Where, however, language used by one assaulted would not, as a matter of law, justify an assault upon him, it is not error to charge the jury that the use of such language would be no defense. More especially is this true, where the language claimed to be defensive was not used in the presence of the person making the assault." See also *Smith* v. *State,* 27 *Ga. App.* 653 (110 S. E. 412), first case. Conduct not amounting to a justification for an assault and battery may nevertheless be pleaded and proved in extenuation or mitigation of damages. Code, § 105-1802; *Ransone* v. *Christian,* 49 *Ga.* 491; *Henderson* v. *Fox,* 80 *Ga.* 479 (2) (6 S. E. 164); *Conley* v. *Arnold,* 93 *Ga.* 823 (2) (20 S. E. 762); *Thompson* v. *Shelverton,* supra; *Hutcheson* v. *Browning,* 34 *Ga. App.* 276 (2) (129 S. E. 125); *Clay* v. *Brown,* 38 *Ga. App.* 157 (6) (142 S. E. 911).

Applying the above principles of law to the facts shown by the record in the present case, a finding was demanded, as a matter of law, that the defendant was not justified in the assault and battery made upon the plaintiff. Notwithstanding any improper remarks that may have been made by the plaintiff to the wife of the defendant, the evidence clearly shows that at the time of such assault and battery the plaintiff used no language, either as to the defendant or his wife, of an opprobrious nature. The pleadings and the testimony of the defendant are not without inconsistencies. The general purport of his attempted justification was that in as-

saulting and beating the plaintiff he acted on the hearsay report of his wife as to the plaintiff's conduct towards her, that he had informed or "promised" the plaintiff that he would beat him if he did not cease annoying her, and that he proceeded to do what he had "contracted" to do. Said he, "All the past occurrences with my wife made me do that, and that and that alone was the reason I did it." In the concluding part of his testimony he places his conduct on an entirely different basis, saying, "It was to keep her from being annoyed every day in performing her civil duties in town. The reason I struck him was to prevent any further annoyances." It is a well-established principle of law that the testimony of a party as a witness in his own behalf is to be construed most strongly against him when it is self-contradictory, vague or equivocal, and not supported by other evidence in his favor. Construing the plaintiff's testimony most strongly against him, it must be said that he did it in order to punish the plaintiff for his alleged past conduct, and not because of anything that was said to him or his wife at the time of the assault and battery. Nor would the defendant have been authorized by any rule of law known to us to strike him in order to prevent annoyance to the wife in the future. Other remedial means are afforded by the law. The defendant could not make for himself a remedy unknown to the law.

But in the brief of counsel for the defendant in error the main defense seems to be that the cause of the assault and battery was really what counsel calls the opprobrium implied in the suggestion of the plaintiff that he and the defendant go into the latter's store, where the wife of the defendant was presumed by the plaintiff to be, and in fact was, and talk the matter over in her presence. We gather from the argument of counsel that the opprobrium, as viewed by the defendant, would consist in the plaintiff's attempt to thus pay further attention or cause annoyance to the wife, notwithstanding the defendant's past warnings that she should be let alone. But however objectionable to the defendant, or inappropriate, or even indiscreet, the suggestion might be termed by a consideration of the propriety of relieving the wife against the plaintiff's presence, the suggestion certainly could not in reason be regarded as opprobrious. There was nothing in the suggestion to indicate to any open mind that the plaintiff proposed to show towards the wife any attention that had been discouraged and remonstrated against.

It permits of no just interpretation except that the plaintiff was seeking an opportunity, inappropriate or not, to appease the wrath of the defendant by an attempted explanation, sufficient or insufficient in the opinion of the defendant, of his conduct, and to make that explanation before his accuser in the presence of her protector. Giving due credit and commendation to a husband's confidence in the accuracy and fairness of a report made to him by his wife, it would be sacrificing truth and justice to sentiment to sanction an interpretation that would characterize the conduct of the plaintiff *at the time of the assault and battery* as opprobrious.

It is further contended that while words may not themselves be opprobrious the circumstances under which they are uttered may make them so, and we are cited to the case of *Tucker* v. *Walters*, 78 *Ga.* 232 (2 S. E. 689), in support of the contention. In that case Tucker stated to Walters that a bill had been rendered to Walters and that he had not disputed it, to which Walters replied, "It is not so," and Tucker repeated that it was. Walters rejoined that it was not so, whereupon Tucker struck him a blow upon the head. The court said that a jury question was presented as to whether the words were opprobrious, because they might be used in such a manner as to imply that Tucker had stated a falsehood or told a lie, under which circumstances the words would be opprobrious or abusive. While the court stated a correct principle of law, that case is readily distinguishable on its facts. There is no contention in the present case that the plaintiff, by his language at the time of the assault and battery, reflected on the defendant or his wife or abused either in any way. It is contended only that the suggestion that the plaintiff and the defendant go in the store and discuss the matter amounted to an opprobrium, which, as we have stated, can not be upheld. It follows from what has been said above that the verdict in favor of the defendant was not authorized. However, in a case where the defendant fails to show justification for an assault and battery, but where it appears that "the injury is small, or the mitigating circumstances are strong, nominal damages only are given." Code, § 105-2001.

■ One special ground of the motion for new trial complains of a portion of the charge of the court which, in effect, instructed the jury that if opprobrious words were used towards the wife the defendant would be justified in the assault and battery upon the plain-

tiff. Although in connection therewith the court charged the jury that the defendant would not be justified in making an assault and battery founded on a past transaction, it is contended that the charge as given was error in that there was nothing in the pleadings or evidence to show that at the time of the assault and battery opprobrious words were used by the plaintiff, but that the pleadings and evidence conclusively show that the wife was not present at the time of the assault and battery, and it is contended that no opprobrious words used in the past or to be used in the future would justify an assault and battery. We have held in the first division of this opinion that a finding was demanded, as a matter of law, that no opprobrious words were used by the plaintiff at the time of the assault and battery committed by the defendant, and it follows that the charge of the court was inapt. If, on the next trial of the case, the evidence fails to show any opprobrious words used at the time of the assault, but should show that on one or more previous occasions the plaintiff did use opprobrious words towards the wife, the court should instruct the jury, not that they might find that the defendant would be justified in making an assault and battery upon the plaintiff, but that the past conduct of the plaintiff towards the wife, if opprobrious words were used towards her, might be taken into consideration by the jury in mitigation of damages.

■ Another special ground complains of a portion of the charge of the court which, in effect, instructed the jury that if they believed that prior to the time of the assault and battery the plaintiff had frequently indulged in such conduct and acts towards and addressed to the wife remarks which were annoying and offensive to her, and affected injuriously in the community her reputation for ·fidelity and chastity, or were calculated to produce such an effect, and if the jury believed such conduct, acts, and remarks had been continuously in operation, and that the defendant and his wife had admonished the plaintiff to refrain therefrom, and that he ignored the admonitions and continued such acts and conduct, and that if the jury believed that at the time of the assault and battery a recurrence thereof was imminent and impending, and that to repel the same the defendant inflicted the assault and battery, and in doing so was acting under the necessity, or reasonably apparent necessity, of repelling or deterring an imminent and impending

recurrence of such conduct on the part of the plaintiff, and was not seeking to avenge or punish the plaintiff for past indignities, and if the jury further believed that the force used was not disproportioned to the insult or injury, then under such a state of facts the defendant would be justified and the jury should so find. The charge, as contended by the plaintiff in error, was unauthorized and inapplicable to the facts of the case, in that there was no contention or evidence that the plaintiff had done anything at any time, or threatened to do anything, which affected or would affect injuriously in the community the wife's reputation for fidelity and chastity, and was further error for the reason that the defendant would not be authorized to assault and beat the plaintiff to prevent a recurrence of opprobrious words or abusive language in the future. We think the objections well taken, and know of no law which justifies an assault and battery because of opprobrious words which are not used at the time of the assault and battery.

■ The sixth ground of the motion for new trial is, in effect, merely an elaboration of the other grounds and is controlled by the ruling in the first division of this opinion.

■ (a) Error is assigned on the ruling of the court in striking on demurrer from plaintiff's petition the allegation that the defendant's wife contracted a serious malady in connection with which she asked the help and advice of plaintiff several years previous to the assault and battery complained of, it being contended that such allegation was proper to illustrate the manner and circumstances under which the plaintiff began his association with the defendant's wife in friendship. The allegation was not germane or relevant to the plaintiff's cause of action, and the court did not err in striking the same.

■ Error is also assigned on the ruling of the court in striking from the petition on demurrer certain allegations as to unpleasant colloquies between the defendant's wife and the plaintiff in regard to extraneous matters in which the defendant took no part, which occurred long before the assault and battery, and which did not, as contended by plaintiff in error, constitute anything that might properly be called a permissive inducement in pleadings in a matter between the plaintiff and the defendant. The court properly struck the allegations from the petition.

■ Nor did the court err in striking, on demurrer, from the

petition the allegation that another person, who was employed in the same drug store with the plaintiff, often greeted the wife of defendant by saying "Hello, Otto." Whatever liberty was permitted another person in respect to the use of a nickname or teasing characterization would not necessarily authorize the plaintiff to indulge in similar conduct, and the allegation not being relevant or material to the plaintiff's cause of action was properly stricken.

■ The court also properly struck from the petition as hearsay the allegation that the "plaintiff was informed that the defendant continued to hit him."

■ The court did not err in overruling the plaintiff's demurrers to the original answer of the defendant. The contention of the plaintiff is that the words "Hello, Otto," which the answer alleged the plaintiff used towards the wife of the defendant, were meaningless in themselves and imported no opprobrium, and that the rest of the allegations should have been stricken because they related to óccurrences prior to the assault and battery and outside of the presence of the defendant and constituted no justification. While, as we have held, the facts referred to would not afford justification for the assault and battery, it was proper for the defendant to plead and prove them for consideration by the jury on the question of mitigation of damages, and without setting out in detail all of the allegations demurred to we think it sufficient to say that the grounds of the demurrer were properly overruled.

■ The amendment filed by the defendant, as set out in the statement of the case hereinbefore, was attacked by general and special demurrers, but it is not deemed necessary or profitable to enter into any detailed discussion concerning them. The amendment, apparently offered and treated as a plea of justification, was allowed after evidence in substantial conformity therewith had been introduced without objection. The court properly overruled the grounds of the demurrer thereto, inasmuch as the allegations, while not showing facts justifying the assault and battery, did show facts which, being proved, could be considered by the jury in mitigation of damages. The ground of the demurrer that the amendment was not allowable because not sworn to is without merit. The allowance of an amendment without an affidavit in accordance with Code, § 81-1310, invoked by the plaintiff in error, is in the discretion of the trial judge, and no abuse of discretion appears in the

present case. *Marsh* v. *Hix,* 110 *Ga.* 888 (2) (36 S. E. 230); *McCall* v. *Wilkes,* 121 *Ga.* 722 (49 S. E. 722); *Robertson* v. *Weaver,* 145 *Ga.* 626 (2) (89 S. E. 769).

■ The court erred in overruling the motion for new trial for reasons shown above.

*Judgment reversed. Broyles, C. J., and Stephens, P. J., concur. Broyles, C. J., presided in this case in place of Felton, J., disqualified.*